**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**101.88 ACRES OF LAND, MORE OR LESS, SITUATED IN ST. MARY PARISH, STATE OF LOUISIANA, and John M. Singleton et al., and unknown owners, Defendants,**

**Avoca, Incorporated, a Louisiana Corporation, Defendant-Appellant.**

No. 77–2768.

United States Court of Appeals,
Fifth Circuit.

May 5, 1980.

John T. Nesser, III, New Orleans, La., for defendant-appellant.

Martin Green, James W. Moorman, Asst. Attys. Gen., Peter R. Steenland, Jr., Carl Strass, Attys., Dept. of Justice, Washington, D. C., Edward Shaheen, U. S. Atty., D. H. Perkins, Jr., Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before WISDOM, TJOFLAT and REAVLEY, Circuit Judges.

WISDOM, Circuit Judge:

This appeal concerns the claim of a landowner for damages in a condemnation proceeding for the government's use of lands contiguous to those condemned.

On February 1, 1977, the United States filed a complaint in condemnation and a declaration of taking covering certain lands in the Atchafalaya River and in Bayou Chene, Bayou Boeuf, and Bayou Black. The taking was authorized by P.L. 90–483, August 17, 1968, 82 Stat. 731, as amended by P.L. 93–251, March 3, 1974, 88 Stat. 28. Funds for the improvements were allocated by P.L. 94–355, July 12, 1976, 90 Stat. 891. Thirty-one tracts of land were condemned, all of them ridges rising from the Atchafalaya River or a bayou. Notice of condemnation was served on more than 200 persons and organizations believed to have an interest in the condemned lands.

Avoca, Incorporated, answered the complaint, claiming ownership of 29 of the 31 tracts. The answer alleged that the government's complaint was inaccurate, because it relied on an incorrect ordinary high water line to delineate the taking. The answer is in the nature of a counterclaim. Avoca alleged that the government was taking certain land without paying for it.

The land in question, Avoca Island, was used to raise crops until 1927, when an exceptionally high flood broke through the levees around the island and inundated it. The levees have never been reconstructed and currently the main body of Avoca Island that is above water is surrounded by water and "island-like" portions of the levee remnants. Essentially, Avoca claims that the water which flooded part of the island is not navigable and that the property now submerged by the 1927 flood water is not subject to a navigation servitude in favor of the United States.

The government seeks to condemn only the levee remnants above the ordinary level of the water that surrounds them. The government project maps show that certain overflowed lands between the levee remnants and the main body of the island are designated to hold dredge spoil from the navigation improvements project. Avoca argues that the government will use this land, knows it will use it, and contends it should be allowed compensation for the submerged land that the government will utilize. Unless this claim is allowed Avoca will be forced to seek compensation for the submerged areas in a separate proceeding in another court. The United States contends that the submerged land is subject to a navigation servitude and hence that it may use it without payment. In any case, the government contends, Avoca cannot force the district court to redraw the boundaries of an accurate and otherwise valid taking.

In response to Avoca's objection to the use of the ordinary high water line to describe the taking, the government filed an amended complaint. It substituted a description in courses and distances of all the tracts of land listed in its original complaint. In response to Avoca's objection that the government was taking more than it had described in the condemnation declaration, the government filed a motion to strike. The motion requested that any claim be struck from the answer that sought compensation for land not condemned.

The district court granted the government's motion. The court reasoned:

> [I]t is highly questionable whether this Court has jurisdiction to expand the issues in this condemnation proceeding to determine the navigability of the overflow waters and defendant's right to compensation for the government use of the submerged land referred to in project maps attached to plaintiff's petition. If jurisdiction does exist, I perceive no advantage, from the standpoint of judicial economy, which would accrue by injecting into this suit a separate, complex issue of navigability of the flood waters.

Avoca appeals from the grant of the government's motion.

## I.

We must first ascertain whether we have appellate jurisdiction. Aside from a few narrow exceptions, appeals lie only from "final decisions" of district courts. 28 U.S.C. § 1291. The ruling on the government's motion was not a final decision. A district court, however, may certify issues for appeal before final decisions, under Fed. R.Civ.P. 54(b), when there is no just reason for delay, or under 28 U.S.C. § 1292(b), when there is a controlling, significant, but undecided question of law. In the present case, there was no certification. Because the ruling was neither certified for appeal nor a final decision, the appeal will lie only if it is within a class of exceptions to the final decision rule.

The relevant exception was cut in *Cohen v. Beneficial Industrial Loan Corp.*, 1949, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, and embroidered in *Gillespie v. U. S. Steel Corp.*, 1964, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199. It concerns "collateral" orders, and embraces "that small class [of interlocutory orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated". *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528.

Interlocutory orders are not lightly considered within the *Cohen* ambit.[1] In *In re Nissan Motor Corp. Antitrust Litigation*, 5 Cir. 1977, 552 F.2d 1088, we noted that for an interlocutory order to be a member of the class of exceptions, "(1) the substance of [the order] must be independent and easily separable from the substance of other claims, (2) at least part of the question of collateralness is determined by the need to secure prompt review in order to protect important interests of any party, and (3) the finality issue is to be examined in the light of practical, rather than narrowly technical, considerations". *Id.* at 1094–95 (quoting *Diaz v. Southern Drilling Co.*, 5 Cir. 1970, 427 F.2d 1118, 1123, *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115).

Applying this three-part test, we take jurisdiction under *Cohen*. The first requirement is that the order be "independent and easily separable from the substance of other claims". The core contention in the part of Avoca's answer that the district court struck was that its claim for compensation was triable in the condemnation proceeding. Avoca's argument is essentially a procedural objection to the conduct of the case: the government by its pleadings ought not to be able to bifurcate the determination of the compensation. This issue is "easily separable from the substance of other claims". It is not a claim on the merits, but rather a claim about which court should hear the merits. It raises a distinct question that can be decided without affecting the determination of compensation for the lands described in the declaration. It is therefore collateral.[2]

---

1. *In re Corrugated Container Antitrust Litigation*, 5 Cir. 1980, 611 F.2d 86, 87; *Beef Industry Antitrust Litigation*, 5 Cir. 1979, 607 F.2d 167, 182; *North American Acceptance Corp. Securities v. Arnall, Golden & Gregory*, 5 Cir. 1979, 593 F.2d 642, 645.

2. *Eisen v. Carlisle & Jacquelin*, 1974, 417 U.S. 156, 171–72, 94 S.Ct. 2140, 2149–50, 40 L.Ed.2d 732; *Cohen v. Beneficial Industrial Loan Corp.*, 1949, 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528; *Litton Systems, Inc. v. Southwestern Bell Telephone Co.*, 5 Cir. 1976,

The second requirement of *Cohen* is that "at least part of the question of collateralness is determined by the need to secure prompt review in order to protect important interests of any party". In this case, prompt review allows both the final determination of Avoca's right to a jury trial concerning compensation for Avoca Island, and the protection of Avoca's interest in the most compendious and least costly resolution of its claims. Avoca will have the right to a jury determination if it can raise its claims in the condemnation proceeding. It will not have such a right if forced to seek compensation in a separate proceeding under 29 U.S.C. § 1346(a)(2), or in the Court of Claims under 28 U.S.C. § 1491. It would be well to decide this issue now. For if we refuse to permit review until the entry of a "final decision" by the district court, and then on appeal decide that Avoca's claim could have been raised, we will put Avoca to the perhaps considerable expense and inconvenience of two trials where one would have done.

The third part of the *Cohen* test requires the application of the maxim that an appellate court should consider an appeal in light of pragmatic rather than technical concerns. This aspect of the test was drawn

539 F.2d 418, 426; *Diaz v. Southern Drilling Co.*, 5 Cir. 1970, 427 F.2d 1118, 1123, *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115.

**3.** The Supreme Court recently pointed up the attention we must give to the facts when applying the *Gillespie* rule under the *Cohen* maxim. Justice Stevens, writing for the Court in *Coopers & Lybrand v. Livesay*, 1978, 437 U.S. 463, 477 n.30, 98 S.Ct. 2454, 2462 n.30, 57 L.Ed.2d 351, showed that *Gillespie* did not support appealability of a Rule 23, Fed.R.Civ.P., class-designation order as a matter of right. The order in *Gillespie* was "marginally final", it resolved an issue of national significance, and hearing the appeal once it was taken served the policy of judicial economy. By contract, a class action certification is "an inherently nonfinal order that tentatively resolve[s] a question that turns on the facts of the individual case; and . . . the indiscriminate allowance of appeals from such discretionary orders is plainly inconsistent with the policies promoted by § 1292(b)". *Cf.* our recent decision in *In re Beef Industry Antitrust Litigation*, 5 Cir. 1979, 607 F.2d 167, 172–73. Justice Stevens observed in closing that "[i]f Gillespie were ex-

out in *Gillespie v. United States Steel Corp.*, 1964, 379 U.S. 148, 85 S.Ct. 308, 13 L.Ed.2d 199. The petitioner in *Gillespie* sought recovery under the Jones Act and under the Ohio wrongful death statute for unseaworthiness. On the defendant's motion, the court struck from the plaintiff's complaint all references to Ohio statutes or to unseaworthiness. Gillespie appealed the ruling on the motion to the Sixth Circuit. That court, over defendant's objection that there was no "final decision" for § 1291 purposes, determined the merits "as though it were submitted on appeal". The Supreme Court affirmed, pointing out that to hear the appeal would not inconvenience the parties or increase their costs and concluded that the resolution of the question was "fundamental to the further conduct of the case".[3]

While we recognize that "in condemnation proceedings appellate review may be had only upon an order or judgment disposing of the whole case . . ." *Catlin v. United States*, 1945, 324 U.S. 229, 233, 65 S.Ct. 631, 633–34, 89 L.Ed. 911, courts in other circuits have allowed review where "the ruling involved is fundamental to the future conduct of the case".[4] The ruling on the motion to strike any reference to Avoca

tended beyond the unique facts of that case, § 1291 would be stripped of all significance". 437 U.S. at 477 n.30, 98 S.Ct. at 2462 n.30.

Chary, then, of being too quick to apply *Gillespie*, we think that the facts in this case warrant its application. As in *Gillespie*, the order here is "marginally final" because it finally determines Avoca's right to a jury trial on one of its claims; and it resolves an important question of the procedural rights of an individual landowner in a federal condemnation action, a question that does not turn on the facts of the individual case, but is of broad and general significance. Moreover, hearing the appeal now best serves the policy of judicial economy by illuminating at the most convenient time the procedural pathway this suit must traverse.

**4.** *United States v. 255.25 Acres of Land, More or Less*, 8 Cir. 1977, 553 F.2d 571, 572–73 n.1; *Washington M. T. A. Auth. v. One Parcel of Land in the District of Columbia*, D.C.Cir. 1975, 514 F.2d 1350; *United States v. 58.16 Acres in Clinton County, Illinois (Cooley)*, 7 Cir. 1973, 478 F.2d 1055.

Island is fundamental in the sense that it defines the content of the case, deciding whether compensation for the land above water and the submerged land will be measured in the original proceeding or not. And it specifies the style of inquiry that the district court will engage in. If we hold that the government's intended use of Avoca Island may be brought into the proceedings, the court will have to answer whether the island is subject to a navigation servitude. If we hold that the use of the island may not be considered, the proceeding will be confined to the value of the land condemned.

■ In sum, we can hear the appeal on the motion without prejudging the merits, we can determine an important interest of Avoca, and our ruling is fundamental to the further conduct of the case. Accordingly, we take jurisdiction.

## II.

■ We turn to the question whether Avoca may in this proceeding seek damages for the government's intended use of the adjacent land. When the government exercises its power of eminent domain through formal condemnation, the nature and extent of the interests to be acquired are in the government's discretion. Once the government specifies those interests unambiguously in a complaint in condemnation, a court has no power to increase or decrease them.[5] A court may then inquire only "whether the use for which private property is authorized by the legislature to be taken, is in fact a public use". *Shoemaker v. United States*, 1893, 147 U.S. 282, 298, 13

S.Ct. 361, 390, 37 L.Ed. 170. The court may ask in this inquiry whether the authorized officials were acting in bad faith or arbitrarily or capriciously by condemning given land.[6] There is no question in the present case whether the levee remnants were condemned for a public use. Nor is there any allegation that the government acted in bad faith or arbitrarily or capriciously by condemning them.

■ The landowner is entitled to compensation, however, that will put him "in as good position pecuniarily as he would have occupied if his property had not been taken". *United States v. Miller*, 1943, 317 U.S. 369, 373, 63 S.Ct. 276, 280, 87 L.Ed. 336. The district court will award damages that may reasonably "be anticipated from use of the property for the purpose for which the condemnation is made". *2,953.15 Acres in Russell County, Alabama (Bikerstaff) v. United States*, 5 Cir. 1965, 350 F.2d 356, 360.[7] In a partial taking, such as in this case, the government impliedly agrees, by its complaint in condemnation, to pay for damages to the landowner's remaining land proximately caused by the taking itself, and by the use of the land taken. In *United States v. Grizzard*, 1911, 219 U.S. 180, 183, 31 S.Ct. 162, 164, 55 L.Ed. 165, 166, the Supreme Court wrote:

Whenever there has been an actual physical taking of a part of a distinct tract of land, the compensation to be awarded includes not only the market value of the part of the tract appropriated, but the damage to the remainder resulting from the taking, embracing, of course, injury

5. Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27; *United States v. 21.54 Acres of Land in Marshall County, West Virginia (Darrah)*, 4 Cir. 1973, 491 F.2d 301; *United States v. 3,317.39 Acres in Jefferson County, Arkansas (Moore Farms)*, 8 Cir. 1971, 443 F.2d 104, cert. denied, 404 U.S. 1025, 92 S.Ct. 674, 30 L.Ed.2d 675; *United States v. Brondum*, 5 Cir. 1959, 272 F.2d 642; *United States v. 9 Acres in St. Mary Parish, Louisiana*, E.D.La.1951, 100 F.Supp. 378, 379 (Wright, J.), aff'd sub nom. *Oyster Shell Products Corp., Inc. v. United States*, 5 Cir. 1951, 197 F.2d 1022, cert. denied, 344 U.S. 885, 73 S.Ct. 184, 97 L.Ed. 685.

6. United States v. Carmack, 1946, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209; *United States v. 58.16 Acres in Clinton County, Illinois (Cooley)*, 7 Cir. 1973, 478 F.2d 1055, 1058–59; *Southern Pacific Land Co. v. United States*, 9 Cir. 1966, 367 F.2d 161, 162, cert. denied, 1967, 386 U.S. 1030, 87 S.Ct. 1478, 18 L.Ed.2d 592.

7. See United States v. Dickinson, 1947, 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789; *United States v. Chicago, B. & Q. R. R. Co.*, 8 Cir. 1936, 82 F.2d 131, 135, cert. denied, 298 U.S. 689, 56 S.Ct. 957, 80 L.Ed. 1408.

due to the use to which the part appropriated is to be devoted.

219 U.S. at 183, 31 S.Ct. at 163.[8]

■ We need to put a gloss on the meaning of "injury due to the use to which the part appropriated is to be devoted". On first glance it could mean, not only diminution in value of the remainder caused by the use of the land taken, but also compensation for an actual physical invasion of the remainder resulting from the intended use of the land taken. Here, Avoca's position is consistent with the second of these meanings. And it is apparent from the project maps attached to the government's complaint that the submerged portions of Avoca Island will be used to hold dredge spoil. The government argues that it can use the submerged land without paying any damages for its use because the waters covering the land are navigable, and hence the land is subject to a navigation servitude. If the government's premise is correct, and the waters covering the island are navigable, then its conclusion is also correct, and it may use the submerged land for any purpose in aid of navigation without compensating the owner. *Allen Gun Club v. United States*, Ct.Cl.1967, 180 Ct.Cl. 423, 429–30.[9] Whether waters are navigable is a question of fact. *The Daniel Ball*, 1871, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999.[10]

If the waters covering Avoca Island are not navigable, their use as a dump for dredge soil would be compensable. The government admits this possibility, but argues that the condemnation court is not the proper forum for testing the truth of its hypothesis of navigability or for awarding damages should it prove false. If Avoca deserves compensation for the use of the island, the government argues, it may obtain it either in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491, or in the district court under 28 U.S.C. § 1346(a)(2). That is, the government's position is consistent with the interpretation of "injury due to the use to which the part to be appropriated is to be devoted" that restricts damages to the remainder to diminution in value.

■ This argument is sound; this interpretation is the proper gloss. A court may not change the extent of a taking. The court is empowered to ascertain the accuracy with which the interests sought to be acquired are described, to award compensation accordingly,[11] and to award damages for diminution in value of land contiguous to the land taken.[12] But it may not do more—in a condemnation proceeding.

■ When looking into the accuracy of the complaint the court will, for example, take evidence to decide whether the government has correctly determined the ordinary high water line. If the line was drawn inaccurately, the court will determine compensation based on an accurately drawn one.[13] When, in a partial taking, the landowner asks the condemnation court for

---

8. *See United States v. 97.19 Acres in Montgomery, Washington, and Alleghany County, Maryland (Hopkins)*, 4 Cir. 1978, 582 F.2d 878, 880–81; *2,953.15 Acres in Russell County, Alabama (Bikerstaff) v. United States*, 5 Cir. 1965, 350 F.2d 356, 360; *United States v. Chicago*, 7 Cir. 1937, 90 F.2d 161, 167–68, *cert. denied*, 302 U.S. 714, 58 S.Ct. 33, 82 L.Ed. 551.

9. *See United States v. Commodore Park*, 1945, 324 U.S. 386, 390–91, 65 S.Ct. 803, 805, 89 L.Ed. 107; *United States v. 62.61 Acres in the City of Virginia Beach (Redd)*, 4 Cir. 1977, 547 F.2d 818, 820.

10. *See Allen Gun Club v. United States*, Ct.Cl. 1967, 180 Ct.Cl. 423, 425–28; *Iowa-Wisconsin Bridge Co. v. United States*, 1949, 84 F.Supp. 852, 866, 114 Ct.Cl. 464, *cert. denied*, 1950, 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386.

11. *United States v. 21.54 Acres in Marshall County, West Virginia (Darrah)*, 4 Cir. 1973, 491 F.2d 301, 306–07.

12. *2,953.15 Acres of Land in Russell County, Alabama (Bikerstaff)*, 5 Cir. 1965, 350 F.2d 356, 360; *United States v. 9 Acres in St. Mary Parish, Louisiana*, E.D.La.1951, 100 F.Supp. 378 (Wright, J.), *aff'd sub nom. Oyster Shell Products Corp., Inc. v. United States*, 5 Cir. 1952, 197 F.2d 1022, *cert. denied*, 344 U.S. 885, 73 S.Ct. 184, 97 L.Ed. 685.

13. *See United States v. 21.54 Acres in Marshall County, West Virginia (Darrah)*, 4 Cir. 1975, 491 F.2d 301, 306–07.

damages to the remainder, the court asks whether the remainder will be less valuable as a result of the taking. "If the taking in and of itself renders the remainder less valuable than before, the owner is entitled to additional compensation." *United States v. 3,817.39 Acres of Land in Jefferson County, Arkansas (Moore)*, 8 Cir. 1971, 443 F.2d 104, 105. The measure of damages is the diminution in market value of the remainder caused by the taking or the use to which the land taken is put.[14] If, instead, the taking increases the value of the remainder, the increment in value may be set off against the compensation awarded for the land condemned. *United States v. Miller*, 1943, 317 U.S. 369, 63 S.Ct. 276, 281, 87 L.Ed. 336.

■ Once the government amended its complaint to describe the above water ridges in courses and distances, there was little question about the accuracy of the description of the taking. And Avoca has not yet asked for damages for diminution in value of the remainder. If, on remand, Avoca amends its answer to request such damages, then the district court may inquire whether the use to which the condemned land is devoted—the dredging of spoil—itself reduces the value of the remainder. But it may not inquire *in the condemnation proceeding* whether the use of the condemned land entails the dumping of spoil on the remainder and that the dumping of spoil—the use of the land not taken—in turn reduces the value of that land. "[A] landowner's right to compensation for . . . a depreciating injury to his remainder has relation only to the affecting use that may be made to the taken part of his own tract . . . ." *Boyd v. United States*, 8 Cir. 1955, 222 F.2d 493, 494.

■ Avoca requests the district court to inquire whether the use of the land not

taken constitutes a taking. Avoca argues that it does—that it constitutes what is in effect a second taking—and that compensation for this second taking ought to be awarded in the condemnation proceeding. But Avoca's demand is one beyond the jurisdiction of the district court to grant. For, to summarize, the district court may in this condemnation proceeding[15] grant, as damages to the remainder, only: (a) reduction in value of the remainder attributable to the severance of the submerged portion of Avoca's tract from the levee remnants, plus (b) reduction in value of the remainder attributable to the use to which the land taken is put (for example, the dredging may constitute a nuisance that would reduce the value of contiguous land), minus (c) any increment in value of the remainder attributable to the use to which the land taken is put (if, for example, the dredging is no nuisance but in fact enhances the remainder's value). The district court was therefore correct in finding that it had no power to inquire into compensation for the use of the land not taken. Avoca's demand for such compensation in effect raises a claim against the United States in a court in which it has not consented to be sued. *United States v. Sherwood*, 1941, 312 U.S. 584, 590–91, 61 S.Ct. 767, 771–772, 85 L.Ed. 1058.

The precise question in this case has been settled in earlier cases. Two recent cases arose in the Eighth Circuit. In *United States v. Winnebago Tribe of Nebraska*, 8 Cir. 1976, 542 F.2d 1002, the United States condemned part of a tract of land for a recreation project. The district court awarded compensation for the land taken and severance damages for the lands not taken. The severance damages "did not result from a depreciation in the value of the remainders caused by the diminution of

14. *U. S. v. Grizzard*, 1911, 219 U.S. 180, 185–86, 31 S.Ct. 162, 164, 55 L.Ed. 165, 166; *Bauman v. Ross*, 1897, 167 U.S. 548, 574, 17 S.Ct. 966, 970, 42 L.Ed. 270. *See* 3 Nichols, Eminent Domain § 8.6204, at 8–181 to 185 (Sackman, ed. 1979); Orgel, Valuation Under The Law of Eminent Domain §§ 47–57, at 225–67 (1953); Palmore, Damages Recoverable in a Partial

Taking, in 1968 Institute on Eminent Domain 55.

15. Other potential damages to a remainder, not applicable here, include, for example, the loss of access from the remainder to the local road network caused by the partial taking. *See United States v. Smith*, 5 Cir. 1962, 307 F.2d 49.

acreage from the taking". 542 F.2d 1002, 1004 n.1. Instead, "[t]he severance damages compensated for the diminished agricultural productivity of the remainder which, the commission found, would result from the heightened level of the ground water table caused by the impounded waters contemplated by the project." *Id.* at 1004. On appeal, the Eighth Circuit reversed as regards the severance damages. The Court reasoned:

> The damage to the remainders results from a direct physical invasion of [the remainders] by the waters of the United States. The invasion is a substantial one that amounts to a taking in the nature of an easement. The award of damages for this taking, not specified in the declaration of taking, has the effect of permitting a counterclaim in a condemnation suit. This may not be done. The nature and extent of the interests to be acquired by condemnation lies within the discretion of the authorized federal officials. It cannot be increased or decreased by the courts.

*Id.* at 1007 (citations omitted).

In another similar case, *United States v. 3,317.39 Acres in Jefferson County, Arkansas (Moore)*, 8 Cir. 1971, 443 F.2d 1004, the United States by its declaration of taking took title to 13.06 acres and flowage easements in an additional 1,947.13 acres out of a tract of land of approximately 10,000 acres for carrying out a water project. The district court "permit[ted] the landowners to introduce evidence relating to alleged flooding beyond the area described in the complaint and declaration of taking". 443 F.2d 1004, 1005. On appeal the Eighth Circuit reversed, because:

> The result of permitting testimony to be introduced before the jury about flooding of lands in addition to those described in the declaration of taking has the effect of increasing the declaration of taking or permitting a counterclaim in a condemnation suit, which may not be done.
>
> The United States, as sovereign, is immune from suit, except when it consents to be sued, and the terms of its consent to be sued in any court defines that court's jurisdiction to entertain the suit. The terms of the Government's consent to be sued in the facts of the instant case are defined by the Tucker Act, 28 U.S.C. § 1491.
>
> The landowner is entitled to recover damages for the actual taking of property which is not included in the declaration of taking, but the award may not be made in a condemnation suit under the theory of damages to the remainder. This must be done in a separate proceeding under the Tucker Act in the Court of Claims.

*Id.* at 1006 (citations omitted).

Cases in this Court draw the same distinction between damages allowable in the condemnation proceeding, and claims for damages that are not allowable because they seek to make the United States pay compensation, in a condemnation proceeding, for an alleged taking of land not formally condemned by the United States. In *United States v. Brondum*, 5 Cir. 1959, 272 F.2d 642, the trial judge gave instructions to the jury to award damages for an "avigation easement", an interest larger than the "clearance or obstruction easement" that the government had condemned in land abutting the Brookley Air Base in Alabama. We reversed and remanded for a new trial, reasoning that:

> The United States Government has complete discretion in determining whether to take a clearance easement or to take an avigation easement, and upon the filing of the declaration of taking and the depositing of the estimated compensation for the taking . . . the title described in the declaration passed to the Government. . . .
>
> In the future, if the Brookley Air Base runways should be changed and there should be low and frequent flights, the Government may institute condemnation proceedings to acquire an avigation easement. Or, if a taking should occur in fact without a proceeding having been instituted, the Brondums . . . have a

remedy under the Tucker Act, 28 U.S.C.A. § 1346(a)(2), or in the Court of Claims, 28 U.S.C.A. § 1491. But in a condemnation proceeding courts cannot compel the United States to take and pay for an easement not described in the declaration of taking.

272 F.2d 642, 646–47. The court reached a similar result in *United States v. 9 Acres in St. Mary Parish, Louisiana*, E.D.La.1951, 100 F.Supp. 378 (Wright, J.), *aff'd sub nom. Oyster Shell Products Corp., Inc. v. United States*, 5 Cir., 197 F.2d 1022, *cert. denied*, 1952, 344 U.S. 885, 73 S.Ct. 184, 97 L.Ed. 685. There the United States condemned land for a floodway. Oyster Shell Products filed a counterclaim alleging that the United States was in fact taking more land than it had described in its declaration of taking, because, by the use of the land condemned for the floodway, Oyster Shell's contiguous land, on which two feed and fertilizer plants were located, would necessarily be flooded. Oyster Shell contended:

> [T]hat the moment the United States built the levees [for the floodway] landward of its properties there was a taking of all of its property within the contemplation of the 5th Amendment, and that it should be compensated for that taking in these proceedings. In effect it alleges that the United States may not evade its obligation to compensate an owner in full for his property by describing only a part of it in the petition for condemnation while actually and in fact taking all of it.
>
> *   *   *   *   *   *
>
> The counterclaim filed herein by the defendant, Oyster Shell Products, Inc., sets up a claim against the United States in a manner and in a court in which the United States has not consented to be sued. It may well be that this claim can be brought against the United States under the Tucker Act, but not in this court nor in these proceedings.

100 F.Supp. 378, 378–79 (citations omitted). Other cases employ the same logic to reach the same result. *See, e. g., United States v. 40.60 Acres in Contra Costa County, California*, 9 Cir. 1973, 483 F.2d 927; *United States v. 6.321 Acres in Suffolk County, Massachusetts*, 1 Cir. 1973, 479 F.2d 404.

None of the cases relied on by Avoca, indeed none of the cases extant, is to the contrary. The cases Avoca cites all have to do either with the district court's inquiry into the accuracy of the government's description of the land to be condemned, or with the valuation of interests in land actually condemned, or with the question whether access rights may be included, in a partial taking, in the damages to the remainder. Thus in *United States v. 21.54 Acres in Marshall County, West Virginia (Darrah)*, 4 Cir. 1973, 491 F.2d 301, the government had located the ordinary high water line at 620 feet, and the landowner, disputing the accuracy of that location, argued that the line was in fact at 610 feet. The accuracy of the description of the land the government seeks to condemn is not at issue in the present case. In *2,953.15 Acres in Russell County, Alabama (Bikerstaff) v. United States*, 5 Cir. 1965, 350 F.2d 356, the government had condemned an overflow easement between elevations 192 and 221 mean sea level. The landowners contended that they had a right in the condemnation proceeding to damages that would be caused to pecan trees and underground deposits of clay, sand, and gravel, all lying between elevations 192 and 221. We held that the landowners were entitled to introduce evidence on the full extent of their interests in the land actually condemned. The present case differs, for Avoca does not seek to increase compensation for its interests in the land condemned, but rather to obtain compensation for the use of land not condemned. Finally, in *United States v. Smith*, 5 Cir. 1962, 307 F.2d 49, the question was whether, in a partial taking, the loss of access to the remainder could be included in calculating compensation for diminution in value to the remainder. We held that, in the circumstances of that case, the loss of access could be included. The case does not stand for the proposition, as Avoca asserts, that a landowner may be compensated in the condemnation action for the use of land not condemned.

All of these cases illustrate that a condemnation proceeding exists for the purpose of allowing the sovereign expeditiously to acquire precisely the interest in land that it believes is required for some project it will carry out and to pay the landowner compensation for only those interests it has acquired, plus any damages that flow directly from the acquisition itself. The sovereign need not, of course, first proceed by formal condemnation. It may use land and leave the landowner to ask the courts to award just compensation under a theory of inverse condemnation. Or it may proceed by formal condemnation and inverse condemnation simultaneously, as it has in the present case, and in a number of the cases discussed above. Then the landowner will receive just compensation, both for diminution in value of the remainder, caused by the formal condemnation, and for the actual taking of his remaining land, caused by the inverse condemnation, though he may have to appear in two proceedings to obtain the totality of that compensation. The 5th Amendment, while it guarantees that compensation be just, does not guarantee that it be meted out in a way more convenient to the landowner than to the sovereign.

Avoca will be entitled to damages for the government's dumping dredged spoil on the island, should there prove to be no navigation servitude over it. In effect, that use could be considered a second taking of previously uncondemned land. But an award for that taking may not be made in this condemnation proceeding under a theory of damages to the remainder of Avoca's land. The only compensation to the landowner allowable in this condemnation proceeding is for the value of the land described in the declaration and damages, if any, deriving from the diminution in value of the remainder because of the partial taking of Avoca's entire tract. Damages for the use of the island because of the government's depositing spoil on the uncondemned land, that is, an actual physical taking, may be sought only in a separate proceeding, either under 28 U.S.C. § 1346(a)(2) in the district court if the amount does not exceed $10,000, or under the Tucker Act, 28 U.S.C. § 1491, in the Court of Claims, if the claim exceeds that amount.[16]

The judgment of the district court is AFFIRMED and REMANDED so that the district court may award just compensation, restricted to the value of the land condemned, plus diminution, if any, in value of the contiguous land not condemned, should Avoca amend its answer and seek such damages.

---

16. *United States v. Winnebago Tribe of Nebraska,* 8 Cir. 1976, 542 F.2d 1002, 1007; *United States v. 40.60 Acres in Contra Costa, Ca.,* 9 Cir. 1973, 483 F.2d 927, 928; *United States v. 21.54 Acres in Marshall County, West Virginia (Darrah),* 4 Cir. 1973, 491 F.2d 301, 306; *United States v. 6.321 Acres in Suffolk County, Massa-* chusetts, 1 Cir. 1973, 479 F.2d 404, 406–07; *United States v. 3,317.39 Acres in Jefferson County, Arkansas (Moore Farms),* 8 Cir. 1971, 443 F.2d 104, 106; *United States v. Brondum,* 5 Cir. 1959, 272 F.2d 642, 646–47.